UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

M.C., *a minor through her parents/guardians* )
R.C. & J.C.; *and* C.L., *a minor through her* )
*parents/guardians* J.L & K.L., )
 )
    *Plaintiffs*, )
 )
v. )   NO. 3:17-CV-337
 )       REEVES/POPLIN
**KNOX COUNTY BOARD OF** )
**EDUCATION** *and* **KNOX COUNTY,** )
**TENNESSEE,** )
 )
 )
    *Defendants*. )

## MEMORANDUM OPINION

On August 4, 2017, Plaintiffs filed this action pursuant to the Individuals with Disabilities Education Act, Title II of the American with Disabilities Act, and § 504 of the Rehabilitation Act, seeking declaratory and injunctive relief [D.1]. Defendants moved to dismiss the action under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted [D. 17].[1] Plaintiffs responded in opposition [D. 20] and submitted materials that, if considered by the Court, would convert Defendants' motion to dismiss into one for summary judgment. Defendants replied [D. 21] and urged the Court not to consider any materials external to the pleadings. For the reasons that follow, Defendants' motion will not be converted; the motion to dismiss will be granted; and this case will be dismissed.

---

[1] The Court struck Defendants' first motion to dismiss [D. 11] on March 21, 2018, for failure to comply with the Court's meet-and-confer requirements [D. 15]. On March 23, 2018, Defendants submitted the required notice [D. 16] and refiled their motion to dismiss [D. 17].

1

## I. BACKGROUND

### A. Legal

#### 1. *Individuals with Disabilities Education Act*

Plaintiffs first allege a violation of the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400-1491o. Congress enacted the IDEA in 1975 to ensure that children with disabilities receive a free appropriate public education (FAPE), which must be provided "in conformity with the individualized education program [IEP] required under section 1414(d) of this title." *Id.* § 1401(9)(D). The IEP has been called "the centerpiece of the statute's education delivery system for disabled children." *Honig v. Doe*, 484 U.S. 305, 311 (1988).

An IEP is a detailed, often lengthy document that is developed and implemented for each student with a disability, in consultation with the student's parents. It sets forth "the child's functionality, her current academic performance, her academic goals, how to measure academic progress, and what accommodations she needs." *I.L. through Taylor v. Knox Cty. Bd. of Educ.*, 257 F. Supp. 3d 946, 953 (E.D. Tenn. 2017) (discussing 20 U.S.C. § 1414(d)(1)(A)(i)). An IEP must also include:

> a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided to enable the child
>
> > (aa)  to advance appropriately toward attaining the annual goals;
> >
> > (bb)  to be involved in and make progress in the general education curriculum … and to participate in extracurricular and other nonacademic activities; and
> >
> > (cc)  to be educated and participate with other children with disabilities and nondisabled children in the activities described in this subparagraph.

20 U.S.C. § 1414(d)(1)(A)(i)(IV); 34 C.F.R. § 300.320(a)(4). Additionally, the IEP must specify "[t]he projected date for the beginning of the services and modifications described in subclause (IV), and the anticipated frequency, location, and duration of those services and modifications." 20 U.S.C. § 1414(d)(1)(A)(i)(VII); 34 C.F.R. § 300.320(a)(7). But Congress has been clear that the statute is *not* to be construed to require any additional information in a child's IEP "beyond what is explicitly required in this section." 20 U.S.C. § 1414(d)(1)(a)(ii).

The IEP team must review a student's IEP at least once each year to assess whether the goals are being achieved. 34 C.F.R. § 300.324(b). Before the school proposes (or refuses) to amend certain aspects of an IEP, it must provide the student's parents with:

> (1) prior written notice [PWN] that explains what the school district proposes to do and why, the factors that are relevant to the proposal, a description of the evaluative methods and results the school district used as a basis for the proposed action, and a description of other options that were considered and the reasons why they were rejected; (2) an opportunity to review all records pertaining to their child; and (3) a full explanation of their rights, including their rights to participate, object, and appeal.

*K.A. ex rel. F.A. v. Fulton Cty. Sch. Dist.*, 741 F.3d 1195, 1203-04 (11th Cir. 2013) (footnotes omitted); 20 U.S.C. §§ 1415(b)-(c); 30 C.F.R. § 300.324(b). The IDEA's procedural safeguards "guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate." *Honig v. Doe*, 484 U.S. 305, 311-12 (1988).

If the parents object to a proposed change, they may request a due process hearing before an Administrative Law Judge. *See* 20 U.S.C. § 1415. The party challenging the IEP bears the burden of persuasion regarding its inadequacy. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62

(2005). Parents that are dissatisfied with the outcome of the administrative process may seek judicial review by filing a civil action in state or federal court. 20 U.S.C. § 1415(i)(2). During the pendency of the proceedings, "the child shall remain in the then-current educational placement," and the IEP shall not be changed. *Id.* § 1415(j). This so-called "stay-put" provision maintains the status quo while the parents seek review. 546 U.S. at 60.

2. *Americans with Disabilities Act and Rehabilitation Act*

Plaintiffs also allege a violation of Title II of the Americans with Disabilities Act (ADA) and § 504 of the Rehabilitation Act. While the IDEA guarantees individually tailored educational services, Title II and § 504 focus on non-discriminatory access to public facilities and federally funded programs more generally. *See Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 756 (2017). Public schools that receive federal funds are covered by all three statutes, and conduct by school staff can violate the IDEA, Title II, and § 504 all at once. *Id.* at 755-56. Even so, "nothing in the IDEA shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the ADA, the Rehabilitation Act, or other Federal laws protecting the rights of children with disabilities." 20 U.S.C. § 1415(l) (cleaned up). The only exception is when the lawsuit seeks relief for denial of a FAPE. *Id.* In those instances, a plaintiff is required to go through the IDEA's grievance procedure before seeking review in court. *Cf. Fry*, 137 S. Ct. at 752-55 ("[I]f, in a suit brought under a different statute [other than the IDEA], the remedy sought is not for the denial of a FAPE, then exhaustion of the IDEA's procedures is not required.").

"[C]laims under the ADA and the Rehabilitation Act are largely the same." *Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 436 n.4 (6th Cir. 1998). Title II of the ADA bars public entities from discriminating against people "by reason of" their disabilities. 42 U.S.C.

4

§ 12132. To comply with Title II, covered entities must make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). Similarly, Section 504 of the Rehabilitation Act provides that no one may be excluded from a program receiving federal funds "solely by reason" of her disability. 29 U.S.C. § 794(a). Both acts require a public entity to administer its services, programs, and benefits in "the most integrated setting appropriate" to the needs of qualified individuals with disabilities. 28 C.F.R. § 35.130(d); 45 C.F.R. § 84.4(b)(2).

### B. Factual

#### 1. *M.C.*

M.C. is a nineteen-year-old woman with Down syndrome who attends school in the Knox County School ("KCS") system in Knoxville, Tennessee. During the 2013-2014 school year, her IEP allotted 30 minutes each day for staff to modify the regular education materials for her benefit. This time was listed on the "Special Education and Related Services" page. The following school year, the IEP was updated, and the material preparation time was doubled.

In April 2015, without issuing a Prior Written Notice to M.C.'s parents, KCS removed the duration and frequency of planning time from M.C.'s IEP. In August 2016, M.C.'s parents requested that this time be added back into the IEP. In response, KCS issued a belated PWN explaining that the planning time had been removed because "[c]urriculum preparation is a teacher responsibility as part of case management," and was not an *additional* service being provided pursuant to the IEP [D. 1, at 6]. M.C.'s parents repeatedly expressed their concerns that without dedicated staff time for material preparation, the modifications were being done "on the fly." KCS

agreed that staff time was necessary to modify the curriculum, but refused to specifically document this time in the IEP.

In April 2017, M.C.'s parents requested a due process hearing on the issue. In their amended complaint, they argued that preparation of materials should be considered a "service" that must be documented in the IEP. KCS moved to dismiss the hearing request for failure to state a claim. On June 29, 2017, the ALJ granted KCS's motion after finding that "the petitioners have provided no legal authority to bolster [their] claim." [D. 17, at 20]. To date, M.C.'s IEP does not document any time for materials modification, although she is still being educated within the general education classroom.

### 2. C.L.

C.L. is a thirteen-year-old student with Down syndrome who also attends school in Knox County. During the 2016-2017 school year, C.L.'s IEP included two hours per week for staff to modify materials, listed under the "Special Education and Related Services" section. Later that school year, the material preparation time was increased to two and a half hours per week.

In April 2017, C.L.'s parents requested that this time be increased to five hours per week. In response, KCS issued a PWN in which it proposed removing *all* allotted curriculum modification time from C.L.'s IEP. Again, KCS explained that because staff are expected to do this work anyway, it does not need to be specifically documented in the IEP. C.L.'s parents timely objected, triggering the "stay-put" provision.[2] They filed a due process complaint, which KCS moved to dismiss. On June 6, 2017, the ALJ granted KCS's motion to dismiss after finding that the parents had provided "no legal authority" to bolster their claim, and had not so much as alleged that the

---

[2] In light of the "stay-put" mechanism, C.L.'s IEP still includes time for curriculum modification, and she is still being educated in the general education classroom. But C.L.'s parents say that unless this Court finds in their favor, the hours will be removed.

omission of this time from the IEP caused C.L. any actual harm [D. 17, at 16-17]. The ALJ declined to reconsider this decision [*Id.* at 18].

On August 4, 2017, M.C. and C.L's parents ("Plaintiffs") filed this action against the Knox County Board of Education and Knox County (collectively "Defendants") on their children's behalf, seeking declaratory and injunctive relief [D. 1]. They allege that both students' IEPs are defective because Defendants removed (or proposed removing) language specifying the amount of time that staff must spend modifying the curriculum for each child. Plaintiffs further allege that Defendants' removal of the curriculum modification time from M.C.'s IEP without a PWN constitutes a procedural violation of the IDEA. Finally, they contend that Defendants' actions amount to discrimination in violation of Title II of the ADA and § 504 of the Rehabilitation Act.

## II. RULE 12(d) CONVERSION

On March 23, 2018, Defendants moved to dismiss this action under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted [D. 17]. Plaintiffs responded in opposition, and attached 125 pages of exhibits in support of their position [D. 20]. In their reply, Defendants urged the Court to disregard the extrinsic evidence submitted by Plaintiffs, and to rule on their motion based on the pleadings alone [D. 21].

If the Court chooses to consider Plaintiffs' proffered exhibits, then Defendants' 12(b)(6) motion "must be treated as one for summary judgment under Rule 56.'" FED. R. CIV. P. 12(d)); *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 487 (6th Cir. 2009). "[F]ederal courts have complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C WRIGHT & MILLER § 1366. However, this conversion "should be exercised with great caution and attention to the parties'

procedural rights." *Id.*; *Tackett*, 561 F.3d at 487. In the Sixth Circuit, courts "have denied plaintiffs' motions to convert when it is unnecessary to consider matters outside the pleadings in deciding a motion to dismiss." *Sherman v. Tennessee*, 2017 WL 2589410, at *10 (W.D. Tenn. June 14, 2017).

The crux of this case boils down to a pure question of law. Under the IDEA, ADA, and/or the Rehabilitation Act, are educational agencies *legally* required to include time for modifying the curriculum within a student's IEP? (The different question of whether schools *should* be required to do this is best reserved for the legislature.) Because none of the exhibits submitted by Plaintiffs for the Court's consideration are necessary to resolve this question, they need not be considered, and Defendants' motion will not be converted.

The Court will decide this matter based solely on the pleadings. Aside from the Complaint, the Court may also consider the administrative decisions that form the basis of Plaintiffs' appeal[3] and M.C. and C.L.'s IEPs, which the Defendants submitted along with their reply. As the Sixth Circuit has noted, "while 'a plaintiff is under no obligation to attach to his complaint documents upon which his action is based ... a defendant may introduce certain pertinent documents if the plaintiff fails to do so.'" *Melton v. Blankenship*, 2009 WL 87472, at *5 (6th Cir. Jan. 13, 2009) (citing *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997)). And "when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335-36 (6th Cir. 2007). In this case, the students' IEPs are central to Plaintiffs' claims, and are referenced throughout the complaint. Accordingly, the Court may also consider M.C. and C.L.'s IEPs in ruling on Defendants' motion to dismiss.

---

[3] In a civil action brought under the IDEA, the district court "shall receive the records of the administrative proceedings." 20 U.S.C.A. § 1415(i)(2)(C). Thus, the ALJ's decisions may be considered in ruling on a motion to dismiss without converting the motion into one for summary judgment. *See, e.g.*, *Sch. Bd. of Manatee Cty., Fla. v. L.H. ex rel. D.H.*, 666 F. Supp. 2d 1285, 1288 (M.D. Fla. 2009).

## III.   RULE 12(b)(6) STANDARD

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must articulate a facially plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When ruling on a Rule 12(b)(6) motion, the court must view the complaint in the light most favorable to the plaintiff and accept all factual allegations in the complaint as true. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). Dismissal is appropriate only if the Court finds that the plaintiff "can prove no set of facts in support of his claims that would entitle him to relief." *Meador v. Cabinet for Human Resources*, 902 F.2d 474, 475 (6th Cir. 1990).

Even with this liberal standard, it is not enough to simply recite the elements of a cause of action or offer up legal conclusions. 550 U.S. at 555. And the Court need not accept as true any "unwarranted factual inferences." *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987). Rather, the complaint must "plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 556. If this is not done—or if there is an "absence of law to support the type of claim made"—then dismissal of the action is proper. *Allen v. Anderson Windows, Inc.*, 913 F. Supp. 2d 490, 498 (S.D. Ohio 2012).

## IV.   DISCUSSION

### A. Individuals with Disabilities Education Act

#### 1. *Omission or removal of time to prepare curriculum modifications*

Plaintiffs say that time for materials preparation must be included in a student's IEP as either a "service" or "support for school personnel," as defined in the IDEA [*see* D. 1, at 2, 8-10; D. 20, at 14]. Defendants agree that dedicated staff time is necessary in order for the modifications to occur, but contend that they are not legally required to document that time in the IEPs. Because

9

neither the IDEA nor its implementing regulations directly address this issue, the Court is left to interpret the statutory and regulatory language regarding "services" (which could refer to either a "related service" or a supplementary service") and "supports for school personnel." Plaintiffs cite to the definitions in the regulations rather than the IDEA itself, but the relevant definitions are essentially the same in both.[4] In some instances, however, the regulations are slightly more detailed and provide additional guidance for this Court.

"Regulations promulgated to effect the purpose of a statute are to be construed in accordance with the well-established principles of statutory construction." *In re Arctic Exp. Inc.*, 636 F.3d 781, 791 (6th Cir. 2011). Thus, "with all matters of regulatory interpretation, we look first to the plain and unambiguous meaning of the regulation, if any." *United States ex rel. Prather v. Brookdale Senior Living Communities, Inc.*, 838 F.3d 750, 763 (6th Cir. 2016) (internal quotation marks and citation omitted). If the terms are ambiguous, the Court will next turn to the regulatory scheme, "reading the regulation in its entirety to glean its meaning." *Id.* (quoting *In re Arctic Exp. Inc.*, 636 F.3d 781, 791-92 (6th Cir. 2011)).

    i.    *"Related services"*

Time for materials preparation was previously listed as a "related service" in M.C. and C.L.'s IEPs. The regulations define "related services" as:

> transportation and such developmental, corrective, *and other supportive services* as are required to assist a child with a disability to benefit from special education, and includes speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, early identification and assessment of disabilities in children, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services for diagnostic or evaluation purposes. Related services

---

[4] *E.g.*, compare 20 U.S.C. § 1401(26) (defining "related services"), *with* 34 C.F.R. § 300.34(a) (same).

10

> also include school health services and school nurse services, social work services in schools, and parent counseling and training.

34 C.F.R. § 300.34(a) (emphasis added). Although the list is not exhaustive, it is also not limitless, and must be interpreted in accordance with the canon of *ejusdem generis*. Under that canon, "[catchall] clauses are to be read as bringing within a statute categories similar in type to those specifically enumerated." *Paroline v. United States*, 134 S. Ct. 1710, 1721 (2014) (quoting *Federal Maritime Comm'n v. Seatrain Lines, Inc.,* 411 U.S. 726, 734 (1973)). Thus, the broad category of "other supportive services" must be read to encompass only those services similar in type to the ones already specified.

The question then is as follows: can "material preparation/curriculum modification time" be considered a "supportive service … required to assist a child with a disability to benefit from special education"? Is it similar in type to, say, "counseling services" or "occupational therapy"? The Court thinks not. The examples provided in 34 C.F.R. § 300.34(a) are all additional services intended to "*assist* a child with a disability to benefit from special education."[5] In contrast, material preparation is not an *additional* service provided to a child by way of an IEP. As the ALJ stated (and this Court agrees), such preparation is "one of the many tasks required of a teacher in order to successfully provide FAPE. In other words, the preparation of materials is only *a means to the end* of providing a specified service." [D. 17, at 20 (emphasis added)].

Further, the examples of "related services" listed in the regulation are more readily quantifiable, and need only be provided if the service is appropriate and the IEP so specifies. For example, C.L.'s IEP lists occupational therapy as a "related service," and states that C.L. is to receive ten therapy sessions per year, at thirty minutes each [D. 21-2, at 25]. (Note that the IEP does not

---

[5] The caselaw in this area reflects this understanding. *See, e.g.*, *C v. Mo. State Bd. of Educ.*, 2009 U.S. Dist. LEXIS 81625, *19 (E.D. Mo. Sept. 8, 2009) (finding that an audiovisual surveillance system designed to ensure a student's safety may "provide Plaintiff with a service calculated to assist him in receiving special education").

specifically allocate time that the therapist must spend *preparing* for each therapy appointment with the student, although at least some amount of prep time is both inevitable and necessary.) If C.L. does not receive four thirty-minute sessions over the course of the school year, the school will have deviated from the IEP, and may even have denied her a FAPE. But not every student with an IEP must attend occupational therapy sessions with this frequency, or at all.

In contrast, curriculum modification is at the heart of "special education" itself, which is defined in the IDEA as "specially designed instruction, at no cost to the parents, to meet the unique needs of a child with a disability." 20 U.S.C. § 1401(29). "Specially designed instruction" is further defined to mean:

> adapting, as appropriate to the needs of an eligible child under this part, the content, methodology, or delivery of instruction—(i) To address the unique needs of the child that result from the child's disability; and (ii) To ensure access of the child to the general curriculum, so that the child can meet the educational standards within the jurisdiction of the public agency that apply to all children.

34 C.F.R. § 300.39(3). Each student with an IEP must be provided specially designed instruction—which may require a certain amount of curricular modifications—but the IDEA does not require that the time spent *preparing* to provide that instruction be documented in the same manner as other "related services." To hold otherwise would lead to impractical results. For example, M.C.'s IEP notes that in her English/Language Arts class, M.C. is to receive modified test formats that include a word bank and multiple choice and short answer questions, with no more than twelve questions, three choices, and four targeted concepts [D. 21-1, at 15]. Only abbreviated concepts are to be tested, and a study guide must be given three days prior to the exam for home review [*Id.*]. The time that an instructor spends creating the study guide and adapting the test may vary based on the topics being tested, the student's grasp of the concepts, and her own training or expertise in crafting modified materials. As Defendants aptly note, "[t]he allocation of a specific

amount of time of preparation necessarily makes assumptions regarding the efficiency and ability of a specific educator. However, in reality, what may take one educator ten minutes to accomplish, may take another fifteen minutes, and a third twenty minutes to complete." [D. 21, at 6 n.4].

Ultimately, it does not matter how long it takes the educator to prepare the modified materials. What matters is that the student *receives* these materials as a part of the specially designed instruction set forth in her IEP. And in this this case, Plaintiffs do not allege that the required modifications detailed in the IEPs are not being provided, or that either student has been denied a FAPE due to the removal, or imminent removal, of material preparation time from their IEPs.[6]

    ii.    *"Supplementary aids and services"*

For similar reasons, material preparation time cannot be considered a "supplementary service" either. "Supplementary aids and services" is defined in the IDEA to mean "aids, services, and other supports that are provided in regular education classes or other education-related settings to enable children with disabilities to be educated with nondisabled children to the maximum extent appropriate." 20 U.S.C. § 1401(33).[7] The regulations suggest "[a] resource room or itinerant instruction" as two examples of supplementary services that may be provided to a student in conjunction with placement in the regular classroom. 34 C.F.R. § 300.115.

In their response to Defendants' motion, Plaintiffs suggest that a "Supplementary Aids/Services and Support for the child … would be an aide with designated time to create the child's modifications." [D. 20, at 9]. The Court agrees that the provision of a paraprofessional may be

---

[6] Defendants say that during the administrative phase of this case, M.C. claimed she was being denied FAPE due to inadequately modified materials, but this claim was dismissed with prejudice by agreement of the parties [D. 17, at 3 n.4, 20]. At a case management conference held on April 11, 2018, Plaintiffs' counsel orally indicated that curriculum modifications are not occurring, but counsel did not move to amend the complaint to include any such allegations. At most, the complaint alleges that the modifications are being done "on the fly"—but they *are* being done.
[7] The regulations make clear that these services are to be provided in extracurricular and nonacademic settings as well. 34 C.F.R. § 300.42.

considered a supplementary aid or service, to the extent that the aide provides itinerant instruction or otherwise works directly with the student.[8] And the frequency and duration of this assistance, if provided, must be documented in the IEP. (In this case, it is. According to the students' IEPs, C.L. is paired with a paraprofessional five time a week for a total of 27 hours and 30 minutes each week [D. 21-2, at 25], and M.C. works with a paraprofessional for 15 hours per week [D. 21-1, at 19].) But to the extent that the aide works with other school staff to the student's general benefit, such assistance is more properly characterized as support for school personnel.

iii. *"Supports for school personnel"*

"Supports for school personnel" is not specifically defined in the IDEA or its regulations, and aside from a brief mention in the Fourth Circuit, its meaning has not been judicially interpreted. *See SE.H. v. Bd. of Educ. of Anne Arundel Cty. Pub. Sch.*, 647 F. App'x 242, 249 (4th Cir. 2016) (listing "special training" as an example of "supports for school personnel"). The Official Comments to the Federal Regulations shed some light on the drafters' intentions:

> Supports for school personnel could also include special training for a child's teacher. However, in order for the training to meet the requirements of [§ 300.320], it would normally be targeted directly on assisting the teacher to meet a unique and specific need of the child, and not simply to participate in an inservice training program that is generally available within a public agency.

64 Fed. Reg. 12,406, 12,593 (Mar. 12, 1999) (discussing 34 C.F.R. § 300.347, since renumbered § 300.320). The Department of Education has also interpreted the phrase to mean training and other "professional development." U.S. Dep't of Educ., "A Guide to the Individualized Education Program" (2007), https://www2.ed.gov/parents/needs/speced/iepguide/ index.html.

---

[8] Some courts have found that classroom aides must be provided if the aide's assistance is necessary to accommodate the special needs of the children with disabilities. *Oberti by Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist.*, 789 F. Supp. 1322, 1328 (D.N.J. 1992) (citing *Dep't of Educ., State of Hawaii v. Katherine D.*, 727 F.2d 809, 813 (9th Cir. 1983)).

In their response to Defendants' motion, Plaintiffs state—without citation—that "support for school personnel" also includes the teacher receiving a trained aide to help with material preparation [D. 20, at 9-10]. This reading does not comport with all other interpretations of the phrase. But even if the assistance of an aide could be considered a "support for school personnel," it does not follow that the aide's individual support tasks must then be itemized and scheduled in the IEP.

Ultimately, an IEP is sufficient if it is "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 207 (1982). In this case, M.C. and C.L.'s IEPs are each more than twenty pages in length, and include detailed assessments regarding present levels of performance, instructional objectives, methods of evaluation, and individualized modifications, services, and accommodations [*see* D. 21-1; 21-2]. So long as the students receive the specially designed instruction described therein, the IEPs are not rendered defective simply because they fail to include a single sentence describing the amount of time that must be spent preparing classroom materials. *See Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017) ("Any review of an IEP must appreciate that the question is whether the IEP is *reasonable,* not whether the court regards it as ideal."). Because neither the IDEA nor its implementing regulations include such a requirement, Defendants did not and could not violate the IDEA by removing (or proposing to remove) the material preparation time from the "related services" page of the students' IEPs, or by refusing to add this time in elsewhere. Accordingly, Plaintiffs have failed to state a claim for a substantive violation of the IDEA.

### 2. *Failure to issue a Prior Written Notice to M.C.'s parents*

Plaintiffs also allege that Defendants' failure to issue a PWN before removing the material preparation time from M.C.'s IEP constitutes a procedural violation of the IDEA. In their motion

to dismiss, Defendants contend that a PWN was not required under the circumstances, and that, even if it were, any procedural error was later cured by belatedly issuing a PWN. Defendants additionally argue that a procedural error cannot be grounds for relief under the IDEA unless the error amounts to a substantive harm that creates a denial of FAPE.

In their response to Defendants' motion, Plaintiffs note that the PWN was "untimely," but otherwise fail to address Defendants' arguments as to this claim [D. 20, at 16]. "It is well understood ... that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *Cunningham v. Tennessee Cancer Specialists, PLLC*, 957 F. Supp. 2d 899, 921 (E.D. Tenn. 2013) (Jordan, J.) (citing *Rouse v. Caruso*, 2011 WL 918327, at *18 (E.D. Mich. Feb. 18, 2011)). Accordingly, Plaintiffs' procedural IDEA claim is deemed abandoned, and may be dismissed on that basis. However, the Court finds that even if Plaintiffs had not abandoned this claim, dismissal would still be proper for two primary reasons.

First, as Defendants correctly point out, a school need only issue a PWN when it proposes or refuses to initiate or change "the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to the child." 20 U.S.C. § 1415(b)(3); 34 C.F.R. 300.503(a). Time to modify classroom materials cannot be considered part of the identification, evaluation, or educational placement of the student, and the Court has already determined that its removal from the IEPs did not deprive Plaintiffs of a FAPE. While it may be a better policy to give parents advance notice of any and all changes to an IEP, Defendants were not legally required to issue a PWN under the circumstances of this case. So long as the educational agency has complied with the procedures set forth in the Act—and the IEP developed through those procedures is "reasonably calculated to enable the child to receive educational benefits"—then the

agency "has complied with the obligations imposed by Congress and the courts can require no more." *Rowley*, 458 U.S. at 206-07.

Second, even if Defendants violated the IDEA in failing to timely issue a PWN, "relief can be granted for procedural violations only if they deny the child a FAPE." *I.L. through Taylor v. Knox Cty. Bd. of Educ.*, 257 F. Supp. 3d 946, 979 (E.D. Tenn. 2017) (citing *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 854 (6th Cir. 2004)). A child is denied a FAPE if the procedural inadequacies

>  (I) impeded the child's right to a free appropriate public education;
>  (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or
>  (III) caused a deprivation of educational benefits

20 U.S.C. § 1415(f)(3)(E)(ii). Otherwise, "technical deviations do not render an IEP invalid." *I.L.*, 257 F. Supp. 3d at 979 (citing *Dong v. Bd. of Educ. of Rochester Cmty. Schs.*, 197 F.3d 793, 800 (6th Cir. 1999)).

In this case, Plaintiffs have not alleged that the removal of the material preparation time from M.C.'s IEP resulted in any substantive harm to M.C., either by impeding her right to a FAPE or depriving her of educational benefits. Even if this removal could be so construed, M.C.'s parents still had ample opportunity to participate in the decision-making process regarding the provision of FAPE to their child. They specifically discussed this issue with the IEP team on several occasions both before and after the time was removed from M.C.'s IEP [*see* D. 1, at 5-7]. The fact that the parents are not happy with the ultimate decision does not mean that they were excluded from the decision-making process. For the foregoing reasons, the Court finds that Plaintiffs have failed to state a claim under the IDEA for a procedural violation.

### B. Americans with Disabilities Act, Title II; and Rehabilitation Act § 504

Plaintiffs also allege a violation of Title II of the Americans with Disabilities Act and § 504 of the Rehabilitation Act. To the extent that this claim is based on an alleged denial of FAPE, it is subject to dismissal because the Court has already dismissed an identical claim under the IDEA.[9] But "a complaint brought under Title II and § 504 might instead seek relief for simple discrimination, irrespective of the IDEA's FAPE obligation." *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 756 (2017). In this case, Plaintiffs say that documenting time for staff to modify the curriculum is a reasonable accommodation or modification that will enable M.C. and C.L. to remain in the regular classroom, and that Defendants' refusal to include this time in the IEPs amounts to discrimination. [D.1, at 10].

To state a claim for discrimination under Title II and § 504, Plaintiffs must show that M.C. and C.L. (1) are disabled; (2) are otherwise qualified to participate in the regular class; and (3) were excluded from the regular class because of their disability.[10] *I.L.*, 257 F. Supp. 3d at 975 (citing *Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 435 (6th Cir. 1998)). The first two elements are not in dispute. As to the third, Plaintiffs do not allege that either student is currently being excluded from the regular classroom. But Plaintiffs claim that they are at *risk* of "separate schooling" due to Defendants' refusal to document material preparation time in the IEPs [D. 20, at 14]. They cite to *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999) for the proposition that "persons with a disability may seek relief *before* harm befalls them," and thus, "they do

---

[9] "[W]hen IDEA claims have been dismissed, courts have dismissed related Title II and § 504 claims. But this occurs only when the IDEA claims allege the denial of a FAPE." *I.L. through Taylor v. Knox Cty. Bd. of Educ.*, 257 F. Supp. 3d 946, 974 (E.D. Tenn. 2017).
[10] "Because the ADA sets forth the same remedies, procedures, and rights as the Rehabilitation Act, *see* 42 U.S.C. § 12133 claims brought under both statutes may be analyzed together." *Thompson v. Williamson Cty., Tenn.*, 219 F.3d 555, 557 n.3 (6th Cir. 2000) (citation omitted).

not have to wait … to be segregated to a separate classroom; rather, they can require the support hours be written into their IEPs *now*." [*Id.* at 12-13].

It is not entirely clear whether or how *Olmstead* applies in an educational setting, since that case specifically dealt with inpatient confinement in state health institutions.[11] But in any case, Plaintiffs have failed to plead sufficient factual content to support a finding that M.C. and C.L. are at "serious risk" of segregation if documentation of material preparation time is not added back into their IEPs, and the Court need not accept as true any unwarranted factual inferences. In fact, Plaintiffs admit that both students are still being educated in the general education classroom along with their non-disabled peers—*even after* the material preparation time was removed from M.C.'s IEP [D. 1, at 4; D. 20, at 14]. Based on the foregoing, the Court finds that Plaintiffs have failed to state a claim under Title II and § 504.

## V.   CONCLUSION

The Court is not unsympathetic to Plaintiffs' claims; Defendants' steadfast refusal to document even an approximate amount of time for curriculum modification in the IEPs after previously doing so is understandably frustrating. But absent some legal basis upon which to afford Plaintiffs relief, the Court cannot order Defendants to include this time in the students' IEPs. Such detailed matters of educational policy are squarely within the legislature's purview. Thus, even accepting

---

[11] In *Olmstead v. L.C. ex rel. Zimring*, the Supreme Court held that the "unjustified *institutional isolation* of persons with disabilities is a form of discrimination." 527 U.S. 581, 600 (1999) (emphasis added). Thus, in order to avoid violating Title II, States must provide community-based treatment for persons with mental disabilities "when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *Id.* at 607. The Department of Justice later interpreted *Olmstead* to "extend to persons at serious risk of institutionalization or segregation." U.S. Dept. of Justice, *Statement of the Department of Justice on the Integration Mandate of Title II of the ADA and Olmstead v. L.C.* (June 22, 2011), http://www.ada.gov/olmstead/q&a_olmstead.htm. But, like *Olmstead*, DOJ's guidance focuses on inpatient institutionalization, and does not address or even clearly apply to an educational setting. Viewing *Olmstead* and the DOJ's guidance as a whole and in context, it is clear that the risk of being educated in a special education classroom is not the type of "institutionalization" or "confinement" with which the Supreme Court was concerned.

the allegations in the complaint as true and making all reasonable inferences in Plaintiffs' favor, the Court finds that Plaintiffs have failed to state a claim upon which relief can be granted. Defendants' motion to dismiss [D. 17] is hereby **GRANTED**, and this case is **DISMISSED**.

**IT IS SO ORDERED.**

_____
**UNITED STATES DISTRICT JUDGE**